1

2

3

4

5 # UNITED STATES DISTRICT COURT

6 ## EASTERN DISTRICT OF CALIFORNIA

7

8 | | | |
|---|---|---|
| CHEK NGOUN, | ) | 1:02-cv-06468-TAG HC |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION FOR WRIT OF |
| | ) | HABEAS CORPUS (Doc. 2) |
| v. | ) | |
| | ) | ORDER DIRECTING CLERK OF COURT TO |
| DERRAL G. ADAMS, Warden, | ) | ENTER JUDGMENT |
| | ) | |
| Respondent. | ) | |
| | ) | |

9

10

11

12

13

14          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

15 pursuant to 28 U.S.C. § 2254.

16 ## PROCEDURAL HISTORY

17          Petitioner is in custody of the California Department of Corrections serving a sentence of

18 eleven years and four months pursuant to a judgment of the Superior Court of California, County of

19 Stanislaus, following his conviction by jury of three counts of attempted murder, California Penal

20 Code § 664/187, with personal use of a firearm, § 12022.5, and the personal infliction of great bodily

21 injury, 12022.7, as well as three counts of assault with a firearm, § 245(a)(2), also with the personal

22 use of a firearm and infliction of great bodily injury.  §§ 12022.5, 12022.7.  (Doc. 17, pp. 1-2; CT

23 607-614; 636-640.)[1]   The California Court of Appeal for the Fifth Appellate District ("5th DCA")

24 affirmed the conviction in an unpublished opinion filed on April 9, 2001.  (Doc. 17, Exh. B, att. Exh.

25 A.)  A petition for review was filed in the California Supreme Court on May 11, 2001.  (Doc. 17,

26 _____

27          [1]Respondent requests that the Court take judicial notice of the documents lodged with his answer.  (Doc. 17, p. 2, fn. 3.)  Pursuant to Federal Rules of Evidence 201, the Court takes judicial notice of the documents lodged by Respondent on July 7, 2003.  (Docs. 17, 18).  Throughout this order, state court Reporter's Transcript will be cited as "RT __," and

28 references to the state court Clerk's Transcript will be cited as "CT __."

Exh. B).  The petition was summarily denied by the California Supreme Court on July 11, 2001. (Doc. 17, Exh. C).

On November 20, 2001, Petitioner filed a petition for writ of habeas corpus with the Superior Court of California, County of Stanislaus ("Superior Court"), raising three claims: (1) insufficient evidence; (2) police misconduct; and (3) failure by the trial court to conduct an evidentiary hearing regarding a sweatshirt.  (Doc. 17, Exh. D).  On November 28, 2001, the Superior Court denied the petition on the grounds that the three claims could have, but were not, raised on direct appeal.  (Doc. 17, Exh. E).

On February 19, 2002, Petitioner filed a habeas petition raising identical claims in the 5th DCA; the petition was denied on March 1, 2002, without comment.  (Doc. 17, Exh. E).  On April 15, 2002, Petitioner presented the two claims raised herein in a habeas petition filed in the California Supreme Court.  (Doc. 17, Exh. E).  The California Supreme Court denied the petition on September 18, 2002.  (Doc. 17, Exh. F).

The instant petition was originally filed on November 14, 2002.  (Doc. 1).   Respondent's answer was filed on July 7, 2003.  (Doc. 17).   Petitioner's traverse was filed on August 20, 2003. (Doc. 21).

## FACTUAL BACKGROUND

On the evening of September 7, 1996, Konane Mendiola and a friend, Gerardo Flores, were talking in the driveway of Mendiola's family home.  (RT 301-302; 319; 324; 341-343; 375; 412-413; 433-435; 474.)  At the residence across the street a party was underway.  (RT 234; 249; 260; 262; 302-303; 307-308;343; 377-378; 435; 443; 648; 719-720.)  Petitioner, his brother Namron, and Eng Leukhamphan, who were attending the party, left and began walking down the street.  (RT 261; 271; 303; 325-326; 344-345; 364; 372-373; 377; 379; 412; 481-483; 721-722.)  Petitioner, followed by his brother and Eng, crossed the street to the driveway and began yelling at Konane and Gerardo, "What are you looking at?  Do you have a problem?"  9RT 231-233; 271-273; 303-306; 321; 324-327; 343-347; 372-373; 378-379; 437-439; 477; 480-482; 532-534; 601; 648; 721-723; 775-777.) Konane responded in the negative.  (RT 346.)  At that point, several other Asians, including neighbors of Konane, attempted to break up the altercation.  (RT 233; 248-249; 273-275; 304-306;

319; 327-328; 349; 379-380; 439; 485; 778-779.)  One man asked Juan, Konane's father, who had

joined the group, if he had a problem.  (RT 347; 412-413; 439; 481.)  Juan stated that he did not, and

then said, "Why don't you guys just leave because nobody here wants any trouble."  (RT 347; 440).

Petitioner then punched Juan on his right cheek.  (RT 348; 368-371; 440; 485; 648.)  Juan told

Konane to "mark" the Petitioner, i.e., to remember him, so he could later press charges against him.

(RT 348; 415; 442.)  Konane looked at Petitioner's face.  (RT 348.)

Petitioner, Namron, and Eng got into Eng's gray Honda Accord.  (RT 241-242; 250-251;

275-278; 285-286; 306; 308-309; 349-351; 372-373; 441; 444-445; 486; 535; 584; 649; 721; 724;

749-750; 752.)  After a minute, Namron got out and drove away in a red Toyota Corolla.  (RT 277;

308-309; 330; 350-352; 372-373; 417-418; 534-535; 725; 748-749.)  Petitioner then told Eng he was

very angry with the people he had argued with and that he was going to get a gun and shoot them; he

directed Eng to drive him home.  (RT 726-728; 750-751; 755-756; 761-762.)   Eng complied.  (RT

241-242; 276-278; 308; 330; 352; 417-418; 445; 486; 488-489; 534-535; 584; 649; 726-728; 747-

749.)  At home, Petitioner retrieved a revolver and returned to Eng's car wearing a dark-colored

hooded sweat shirt.  (RT 729; 731; 764; 786.)  Eng drove Petitioner back to the area where the

altercation had occurred, made a u-turn, turned off the car's lights, as Petitioner had directed him to

do, and parked the car.  (RT 731-733; 764-765; 767; 770-771.)  Petitioner told Eng to wait by the

nearby school to pick him up.  (RT 735; 737-738; 764; 771-772.)  Petitioner then got out of the car

and walked toward the Mendiola's residence. (RT 733-735; 771-772.)

Approximately fifteen minutes after the initial argument, Petitioner walked quickly down the

sidewalk toward Juan, Konane, and Gerardo, who were still standing in front of the Mendiola house.

(RT 236-238; 240; 245; 253-260; 270-272; 282; 310; 353-356; 369; 414; 417; 445-447; 491; 504;

533-534; 554; 564-565; 648-650.)   Petitioner, who was wearing a dark-colored hooded sweatshirt

with the hood half-way up, raised his right arm, brandishing a gun in his hand.  (RT 240; 253; 254-

256; 258-259; 262; 265-266; 284; 312; 331; 354-357; 420; 423; 447-448; 453; 460-461; 498-499;

533-534; 583; 602; 650-651.)  Konane turned and shouted, "Duck!"  (RT 332; 357; 424; 449.)

Petitioner aimed and fired approximately seven shots at Juan, Konane, and Gerardo.  (RT 235-238;

242-244; 251; 254-258; 265-267; 298; 310-313; 315; 331; 353; 355-357; 424; 448; 450-452; 492-

493; 496-497; 504-505; 534; 735-737; 779.)  Juan ducked and attempted to hide behind a tree and a car, but was shot by Petitioner in his left side.  (RT 257; 266; 323; 449; 451-453; 472-473; 493; 496; 498; 505; 507.)  Petitioner shot Konane in the back as he tried to run away; Konane continued running down the street.  (RT 357; 367; 424-425; 432; 450.)  Gerardo, who was in the driveway, ran about 20 yards before Petitioner shot him in the right calf.  (RT 254; 310-311; 313; 315; 319; 331-332; 450.)  Petitioner then turned and quickly walked away.  (RT 281-282; 313; 357; 453; 456; 494-495; 497-498.)

Eng, who had waited at the nearby school, drove away when Petitioner failed to return to the car.  (RT 737; 739-740; 772-774.)  Subsequently, Eng was stopped by police officer's investigating the shooting and, in an in-field show-up, Konane identified Eng as one of the three men involved in the original altercation and the driver of the gray Honda Accord.   (RT 363-366; 428; 514; 517-521; 541-545; 576; 578-579; 742; 791-792.)  After his arrest, Eng identified Petitioner as the perpetrator. (RT 806-808.)   Eng explained to police how Petitioner had directed him to take him home to get the gun and then return to kill the victims.  (RT 742-743; 791; 811; 816-817.)

Later that evening, police arrested Petitioner at his home.  (RT 607; 621-622.)  During a search of Petitioner's bedroom, police found a dark blue-hooded sweat shirt.  (RT 608-611; 639-640; 1018-1021; 1040-1041.)  Also later that evening at the hospital, Konane identified Petitioner as the one who had engaged him in the original argument, the one who had punched his father, and the one who had shot at him, his father, and Gerardo.  (RT 368-370; 526-527; 615.)  At trial, Konane again positively identified Petitioner as the shooter.  (RT 370-372; 432.)  Konane also identified Namron and Eng as participants in the altercation, and testified that Eng drove the gray car and Namron the red car.   (RT 372-374.)  Konane's father, Juan, identified Namron as being present at the party across the street.  (RT 464; 466; 468.)

In Petitioner's defense, Namron testified that he saw Petitioner, Eng, and Eng's brother-in-law argue with the victims, that Namron, driving the red car, and Eng and Petitioner in Eng's car, all returned home, and that Petitioner never left home after that.  (RT 843; 853-859; 863; 872-881; 883.) Petitioner's father also claimed that Petitioner never left their house before police arrived.  (RT 895; 901-902; 908.)

Petitioner testified that after drinking enough alcohol to be intoxicated and smoking marijuana, he arrived at the party across from the victims' residence. (RT 918; 924; 929-930; 935.) Petitioner left the party to urinate outside, when Konane Mendiola said, "What's up with that?" (RT 930-932; 983-985; 1008-1009.) Petitioner responded, "What's up." (RT 932; 984-985; 1009-1010.) He then crossed the street, confronted Konane, asking, "You gotta problem with me? What's up?", and then pushed Konane, who responded by asking Petitioner if he had a problem. (RT 932-934; 985-989; 1010-1011.) Gerardo grabbed Petitioner, and Petitioner pushed him hard. (RT 934; 989-991.) Konane struck Petitioner on the arm, causing him to fall to the ground. (RT 936; 990-991; 1011-1012.) Petitioner was restrained by Eng and others from the party. (RT 936-939; 992-994; 1012-1014.) Petitioner and his friends got in their cars and returned home, where Petitioner remained until police arrived. (RT 941-943; 945; 996-998.)

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7, 120 S.Ct. 1495 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh, 521 U.S. 320, 117 S.Ct. 2059 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is

therefore governed by the AEDPA.

**II.  Legal Standard of Review**

Under the AEDPA, a petition for writ of habeas corpus will not be granted unless the adjudication of a state prisoner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or  "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166 (2003); Williams v. Taylor, 529 U.S. at 413, 120 S.Ct. 1495; Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004).

The Supreme Court explains that:

> [A] state court decision is "contrary to" our clearly established [Supreme Court] precedent if the state court it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or "if the state court confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision and nevertheless arrives at a result different from [Supreme Court] precedent.
> . . . .
>
> A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case.
> . . . .
>
> The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable.

Lockyer v. Andrade, 538 U.S. at 73, 75 (citations omitted).  Any factual determinations made by the state court are presumed correct unless rebutted by clear and convincing evidence.  Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029 (2003); Gonzalez v. Pliler, 341 F.3d 897, 903 (9th Cir. 2003).

To determine whether a state court decision is contrary to or an unreasonable application of federal law, the federal habeas court looks to the "last reasoned decision of [a] state court as the basis of the state court's judgment."  Powell v. Galaza, 328 F. 3d 558, 563 (9th Cir. 2003) (quoting Franklin v. Johnson, 290 F.3d 1223, 1233 n. 3 (9th Cir. 2002)).  However, when the state court provides no reasoning for its decision, the federal court independently reviews the record to determine whether under the AEDPA,  the state court properly denied habeas relief, focusing on

1   whether the state court's resolution of the petitioner's claim was an unreasonable application of

2   clearly established federal law. See Greene v. Lambert, 288 F. 3d 1081, 1088-89 (9th Cir. 2002);

3   Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2002).  "Independent review of the record is not de

4   novo review of the constitutional issue, but rather, the only method by which we can determine

5   whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d

6   848, 853 (9th Cir. 2003).

7        **A.    Habeas Review of State Court Questions of Law**

8        Challenges to purely legal questions resolved by the state court are reviewed under 28 U.S.C.

9   § 2254(d)(1). "The question on review is (a) whether the state court's decision contradicts a holding

10  of the United States Supreme Court; or (b) whether the state court, after identifying the correct

11  governing Supreme Court holding, then unreasonably applied that principle to the facts of the

12  prisoner's case. " Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004).

13       The AEDPA denies habeas relief on any claim adjudicated on the merits in state court unless

14  the state court proceeding resulted in a decision that was contrary to, or involved an unreasonable

15  application of, clearly established Federal law, as determined by the United States Supreme Court.

16  § 2254(d)(1)'s reference to "clearly established Federal law" means the holdings (not dicta) of the

17  Supreme Court's decisions, at the time of the state court's decision. Lockyer, 538 U.S. at 412.  "A

18  state court's decision is 'contrary to' clearly established Supreme Court precedent if the state court

19  applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court

20  confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme

21  Court and, nevertheless, arrives at a result different from its precedent." Lambert, 393 F.3d at 974

22  (citations omitted).  "The 'unreasonable application' standard captures those cases in which 'the state

23  court identifies the correct governing legal principle from [the Supreme] Court's decisions but

24  unreasonably applies that principle to the facts of the prisoner's case.'" Id., quoting Williams v.

25  Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495 (2000).  The Supreme Court instructs that in applying the

26  "unreasonable application" standard, a federal habeas court should ask whether the state court's

27  application of clearly established federal law was objectively unreasonable.  Taylor, 529 U.S. at 413.

28  Thus, a habeas writ cannot issue if the federal habeas court in its own judgment concludes that the

state court decision applied clearly established federal law incorrectly; the application must also have been objectively unreasonable. Id.

**B.      Review of State Court Questions of Fact**

Federal habeas challenges to purely factual questions determined by the state courts are reviewed under 28 U.S.C. §§ 2254(d)(2); "[t]he question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record. [F]act-based challenges founded on evidence raised for the first time in federal court are reviewed under § 2254(e)(1); the question on review is whether the new evidence amounts to clear and convincing proof sufficient to overcome the presumption of correctness given the state court's factual findings." Lambert, 393 F.3d at 978. Thus, under the AEDPA, state court factual determinations are presumed correct in the absence of clear and convincing evidence to the contrary. In addition, state court decisions which are adjudicated on the merits and based on factual determinations will not be overturned on habeas review under AEDPA unless the decisions were objectively unreasonable in light of the evidence presented in the state court proceedings. Lockyer, 538 U.S. at 75.

The Ninth Circuit Court of Appeals recently interpreted §§ 2254(d)(2) and 2254(e)(1)[2], and held both provisions apply to challenges supported by separate categories of evidence. Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); Lambert, 393 F.3d at 971-973. In Taylor, the Ninth

---

[2]  §§ 2254(d)(2) and 2254(e)(1) address whether, and to what extent, a federal district court is bound by state court findings on any of the dispositive factual questions presented in a federal habeas petition. These statutes provide as follows:

(D) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
. . .

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgement of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption by clear and convincing evidence.

1  Circuit held that the "unreasonable determination" clause of § 2254(d)(2) applies to intrinsic review

2  of a state court's process, i.e., circumstances in which a petitioner challenges the state court's

3  findings based entirely on the state court record. Id. at 999-1000.  In Taylor, the Ninth Circuit also

4  held that § 2254(e)(1) applies to challenges based on extrinsic evidence, i.e., evidence presented for

5  the first time in federal court. Id.  As explained in Taylor: "[I]t is not enough that we would reverse

6  in similar circumstances if this were an appeal from a district court decision; rather, we must be

7  convinced that an appellate panel, applying the normal standards of appellate review, could not

8  reasonably conclude that the finding is supported by the record." Id. (citations omitted). Likewise,

9  mere doubt as to the adequacy of the state court's findings of fact is insufficient; "we must be

10  satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is

11  pointed out would be unreasonable in holding that the state court's fact-finding process was

12  adequate. Id.; Lambert, 393 F.3d at 972.

13      In the event a habeas petition presents no intrinsic challenge to a state court's factual

14  determinations, or if it does, the factual determinations survive an intrinsic review, the factual

15  determinations are then "dressed in a presumption of correctness, which[  ] helps steel them against

16  any challenge based on extrinsic evidence." Id.  State court factual  findings "may be over-turned

17  based on new evidence presented for the first time in federal court only if such new evidence

18  amounts to clear and convincing proof that the state-court finding is in error." Id.

19    **C.    Review of State Court Mixed Questions of Law and Fact**

20      A mixed question of law and fact is one that requires the application of legal principles to

21  historical and other facts. § 2254(e)(1)'s presumption of correctness is restricted to pure questions of

22  historical fact. Lambert, 393 F.3d at 976. However, "[s]tate decisions applying law to facts are

23  governed by § 2254(d)(1); however, factual findings underlying the state court's conclusions on the

24  mixed issue are accorded a presumption of correctness." Id., citing Jeffries v. Wood. 114 F.3d 1484,

25  1498 (9th Cir. 1997) (AEDPA "further restricts the scope of federal review of mixed questions of law

26  and fact. De novo review is no longer appropriate; deference to the state court factual findings is."),

27  citing Rupe v. Wood,93 F.3d 1434, 1444 (9th Cir. 1997) (voluntariness of confession is a legal

28  question not entitled to presumption of correctness but the state court's finding that no threats or

1  promises were made was "essentially a factual conclusion, which is entitled to a presumption of

2  correctness").

3      A federal court reviewing a state court decision based on a mixed question of law and fact

4  must "first separate the legal conclusions from the factual determinations that underlies it. Fact-

5  finding underlying the state court's decision is accorded the full deference of §§ 2254(d)(2) and

6  (e)(1), while the state court's conclusion as to the ultimate legal issue–or the application of federal

7  law to the factual findings–is reviewed per § 2254 (d)(1) in order to ascertain whether the decision is

8  'contrary to, or involved an unreasonable application of, clearly established' Supreme Court

9  precedent." Lambert v. Blodgett, 393 F.3d at 977-978.

10 **III.  Review of Petitioner's Claims**[3]

11     The instant petition alleges the following grounds for relief:

12 Ground 1.     Insufficient evidence was presented to support Petitioner's conviction.

13 Ground 2.     Petitioner's due process rights were violated by the trial court's refusal to
              conduct an evidentiary hearing regarding the admissibility of the sweatshirt at
14            trial.

15     **A.  Grounds One and Two Are Procedurally Barred.**

16     Respondent contends that Petitioner's claims in Grounds One and Two are procedurally

17 barred from federal habeas review because they were not raised on direct appeal. Ex parte Dixon, 41

18 Cal.2d 756, 759, 264 P. 2d 513 (1953).   (Doc. 17, p. 3).  The Court agrees.

19     A federal court will not review claims in a petition for writ of habeas corpus when the state

20 court denied relief on those claims based on a state procedural law that is both independent of federal

21 law and adequate to support the judgment.  Ylst v. Nunnemaker, 501 U.S. 797,  801, 111 S. Ct. 2590

22 (1991);  Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546 (1991).  "A district court

23 properly refuses to reach the merits of a habeas petition if the petitioner defaults on the particular

24

25     [3]Petitioner also raises, for the first time in his traverse, several new issues.  However, "[a] Traverse is not the proper
26 pleading to raise additional grounds for relief." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994).  In order for
   the State to be properly advised of new issues and to have an opportunity to respond, such issues should be raised in an
27 amended petition or in some type of supplement to the original petition, e.g., a statement of additional grounds.  Id. at 507.
   Habeas claims that are not raised before the district court in the habeas petition are not properly raised, and are not, therefore,
28 cognizable on appeal.  King v. Rowland, 977 F.2d 1354, 1357 (9th Cir. 1992).  Accordingly, the Court will not address the
   issues raised for the first time in Petitioner's Traverse.

state's procedural requirements and is unable to demonstrate cause and prejudice or a fundamental miscarriage of justice." Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000). This doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32.

The mere occurrence of a procedural default will not necessarily bar a federal court from reviewing claims in a petition for writ of habeas corpus. For the procedural default doctrine to apply and thereby bar federal review, the state court must also "'clearly and expressly' state that its judgment rested on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263, 109 U.S. 1038 (1989), citing Caldwell v. Mississippi, 472 U.S. 320, 327, 105 S.Ct. 2633 (1985) (quoting Michigan v. Long, 463 U.S. 1032, 1041, 103 S.Ct. 3469 (1983)).

1.  State Law Procedural Ground - the Dixon Rule.

The first step in deciding whether there has been a procedural default is to determine whether the state court clearly and expressly denied relief on a state procedural ground. Here, Petitioner pursued a direct appeal, but did not raise the issues now contained in his federal habeas petition. Rather, Petitioner presented the instant claims to the Superior Court for collateral review in a petition for writ of habeas corpus in the Superior Court for the County of Stanislaus. (Doc. 17, Exh. E.) The Superior Court denied Petitioner's habeas on November 28, 2001, finding that all of his grounds for relief "could/should have been raised on direct appeal. The appeal to the 5th District Court of Appeal has already been heard." (Id.; Minute Order of November 28, 2001).

Respondent correctly notes that the Stanislaus County Superior Court's ruling denying Petitioner's state habeas petition is premised on the rule articulated in Ex parte Dixon, which provides that:

> The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from the judgment of conviction.

Ex parte Dixon, 41 Cal. 2d at 759. Pursual to the Dixon rule, in a habeas corpus proceeding, a California court will not review the merits of a claim if that claim could have been raised in a timely appeal, but was not.

///

1  The California Supreme Court denied Petitioner's subsequent habeas petition, also containing

2  the same claims, without citation or comment. (Doc. 17, Exh. F).  By its silent order denying review

3  of the Superior Court's decision denying habeas relief,  the California Supreme Court is deemed to

4  have denied Petitioner's claims for the same reasons stated in the decision of the Superior Court.

5  Ylst, 501 U.S. at  801, 803 (explaining that "Where there has been one reasoned state judgment

6  rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same

7  claim rest upon the same ground.").  As the last state court to give reasons for its judgment, the

8  Superior Court denied the petition unambiguously on state law procedural grounds, i.e., the Dixon

9  rule.  The next step is to determine whether the Dixon rule is both independent of federal law and

10 adequate to support the judgment. If it is, habeas relief is procedurally barred.

11      2.  Independence.

12      Even when a petitioner has violated a state procedural law, the procedural default doctrine

13 does not bar federal habeas relief unless the state procedural law is both independent of federal law

14 and adequate to support the judgment.  Coleman, 501 U.S. at 729-32, 735.  For a state procedural

15 rule to be independent of federal law, "the state law basis for the decision must not be interwoven

16 with the federal law."  La Crosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (citing Michigan v.

17 Long, 463 U.S. at 1040-41, and Harris, 489 U.S. at 265); Morales v. Calderon, 85 F.3d 1387, 1393

18 (9th Cir. 1996) (quoting Coleman, 501 U.S. at 735).  A state law ground is interwoven with federal

19 law if "the state has made application of the procedural bar depend on an antecedent ruling on

20 federal law [such as] the determination of whether federal constitutional error has been committed."

21 Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

22      The Ninth Circuit Court of Appeals determined that prior to 1998, the Dixon rule was not

23 independent of federal law.  Park v. California, 202 F.3d 1146 (9th Cir. 2000).  In Park, the Ninth

24 Circuit reasoned that because a fundamental constitutional error exception to the Dixon rule existed

25 under state law, application of the Dixon rule necessarily involved consideration of federal law

26 issues and therefore was "interwoven with the federal law."  Id. at 202 F.3d at 1152-53.  Two years

27 earlier, the California Supreme Court explicitly stated that it would no longer consider whether an

28 error alleged in a state petition constituted a federal constitutional violation.  In re Robbins, 18

1  Cal.4th 770, 811-812 & n. 32, 77 Cal. Rptr. 2d 153 (1998).  In making it clear that it would no longer

2  consider federal law in applying the Dixon rule and its exceptions, the California Supreme Court

3  stated:

4      [W]e shall, in this case and in the future, adopt the following approach as our
    standard practice: We need not and will not decide whether the alleged error

5      actually constitutes a federal constitutional violation.  Instead, we shall assume, for
    the purpose of addressing the procedural issue, that a federal constitutional error is

6      stated, and we shall find the exception inapposite if, based upon our application of
    state law, it cannot be said that the asserted error led to a trial that was so

7      fundamentally unfair that absent the error no reasonable judge or jury would have
    convicted the petitioner.

8  In re Robbins, 18 Cal. 4th at  811-812 & n.32.

9      In 2003, the Ninth Circuit decided that the California Supreme Court's denial of a  habeas

10  petition for untimeliness constituted an independent and adequate state ground barring federal habeas

11  relief:

12      [W]e respect the California Supreme Court's sovereign right to interpret its state
    constitution independent of the federal law.  Applying Robbins prospectively, we

13      affirm the district court's determination that the California Supreme Court's post-
    Robbins denial of [a] state petition for lack of diligence (untimeliness) was not

14      interwoven with federal law and therefore is an independent procedural ground.

15  Bennett v. Mueller, 322 F. 3d 573, 583 (2003). Thus, application of the untimeliness bar is now

16  independent of federal law.

17      Although Bennett did not involve the Dixon rule per se, its rationale applies with equal force

18  to a post-Robbins application of  the Dixon bar because the Dixon bar and the untimeliness bar are

19  both subject to analogous constitutional error exceptions and state court consideration of post-

20  Robbins applications of these bars no longer involves federal law. See La Crosse, 244 F.3d at 707

21  n. 29; Bennett, 322 F.3d at 1583; In re Robbins, 18 Cal. 4th at 811-812 & n.32. Thus, the Court

22  concludes that a post-Robbins invocation of the Dixon rule is independent of federal law.

23      To determine whether the state court's application of the Dixon rule is independent of federal

24  law in this case, the Court must look at the state decision invoking the Dixon rule.  See Bennett, 322

25  F. 3d at 582-83; Park 202 F.3d at 1153; La Crosse, 244 F. 3d at 707.  Here, the Superior Court

26  invoked the Dixon rule when it denied Petitioner's habeas petition on November 28, 2001.  (Doc. 17,

27  Exh. E).  The California Supreme Court thereafter silently denied Petitioner's same habeas claims on

28

1   September 18, 2002.  (Doc. 17, Exhs. E, F.)  <u>Robbins</u> was decided on August 3, 1998.  Because the

2   state court's application of the <u>Dixon</u> rule was "post-<u>Robbins</u>" and therefore predicated only upon

3   consideration of state law, it was independent of federal law regardless of whether the Court looks at

4   Petitioner's first or last state habeas petition.

5         3.  <u>Adequacy</u>.

6         A state procedural rule on which the state relies to establish a procedural default must also be

7   "adequate to support the judgment."  <u>Coleman</u>, 501 U.S. at 735.  A state procedural law is adequate

8   to support the judgment when it is "well-established and consistently applied."  <u>Bennett</u>, 322 F.3d at

9   582 (citing <u>Poland v. Stewart</u>, 169 F. 3d 573, 577 (9th Cir. 1999)).  The question of whether a state

10  procedural default rule is well-established and  consistently applied is determined when the actual

11  default occurs, not when the state court applies its procedural rule to bar the petitioner's claim.

12  <u>Fields v. Calderon</u>, 125 F.3d 757, 760-61 (9th Cir. 1997); <u>Calderon v. U.S. Dist. Ct. For E.D. of Cal.</u>,

13  103 F.3d 72, 75 (9th Cir. 1996), <u>cert. denied</u>, 521 U.S. 1129, 117 S.Ct. 2532 (1997) (relevant time to

14  assess application of the <u>Dixon</u> rule is when petitioner "had an opportunity to raise the claims on

15  direct appeal").  <u>See</u> <u>Calderon v. Bean</u>, 96 F.3d 1126, 1131 (9th Cir. 1996), <u>cert. denied</u>, 520 U.S.

16  1204, 117 S.Ct. 1569 (1997) (evaluating the <u>Dixon</u> rule at the time petitioner filed a direct appeal).

17  Here, the relevant date is May 14, 1999, when Petitioner filed his opening brief on direct appeal.

18  (Doc. 17, Exh. A). Thus, the appropriate inquiry is whether the <u>Dixon</u> rule was well-established and

19  consistently applied as of May 14, 1999.

20        a.  <u>Well-Established</u>.

21        In <u>Park</u>, the Ninth Circuit analyzed California's procedural limitations on habeas corpus

22  claims, including the <u>Dixon</u> rule, and found that prior to 1993, they were  "undefined and imprecise."

23  <u>Park</u>, 202 F.3d 1151-53. As a result, the Ninth Circuit determined that such state procedural bars

24  were neither well-established nor consistently applied prior to 1993. <u>Id.</u>  In its analysis, the Ninth

25  Circuit noted the California Supreme Court's decisions in <u>In re Clark</u>,5 Cal. 4th 750, 21 Cal.Rptr. 2d

26  509 (1993) and <u>In re Harris</u>, 5 Cal. 4th 813, 21 Cal. Rptr. 2d 373 (1993) and evaluated their respective

27  impact upon applications of the untimeliness rule and the <u>Dixon</u> rule: "These decisions were

28  intended to 'reestablish California's procedural rules governing state habeas petitions and clearly

define and limit the applicable exceptions.'" <u>Park</u>, 202 F.3d at 1151-52 (quoting <u>Fields</u>, 125 F.3d at 763-74).

The California Supreme Court decided both <u>In re Clark</u> and <u>In re Harris</u> on July 29, 1993. <u>In re Clark</u>, 5 Cal.4th 750; <u>In re Harris</u>, 5 Cal. 4th 813. Thus, these decisions had been the law for more than five years when Petitioner's procedural default occurred on May 13, 1999.  The <u>Dixon</u> rule was established in 1953, when <u>Ex parte Dixon</u> was decided. <u>Ex parte Dixon</u>, 41 Cal. 2d 756. Given the longstanding tenure of the <u>Dixon</u> rule, and the California Supreme Court's decisions "clearly defin[ing] and limit[ing] its applicable exceptions," the Court concludes that the <u>Dixon</u> rule was well-established at the time of Petitioner's May 14, 1999 procedural default. <u>Fields</u>, 125 F.3d at 763-64.

b.  <u>Consistently Applied</u>.

The Court next considers whether the <u>Dixon</u> rule was consistently applied at the time of Petitioner's procedural default.  The Ninth Circuit established a burden-shifting process to determine whether a state procedural rule is adequate:

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner.  The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including
> citation to authority demonstrating inconsistent application of the rule.  Once having done so, however, the ultimate burden is the state's."

<u>Bennett</u>, 322 F.3d at 586.  In his answer to the petition, Respondent alleges that "Petitioner's claims are exhausted but procedurally defaulted and barred from federal habeas corpus review."  (Doc. 17, p. 3.)  Respondent's supporting attached memorandum of points and authorities specifically identifies the defaulted claims and discussed the applicable rules regarding a <u>Dixon</u> default. (Doc. 17, pp. 10-15).  Respondent has thus satisfied his initial burden of pleading the existence of an independent and adequate state procedural ground as an affirmative defense, and thereby shifted the burden to place that defense in issue to Petitioner.

In order to meet his burden under <u>Bennett</u>, Petitioner need only assert specific factual allegations that demonstrate the inadequacy of the <u>Dixon</u> rule, including citations to authority demonstrating an inconsistent application of the <u>Dixon</u> rule as of May 1999.  <u>Id.</u> In his traverse,

1   Petitioner failed to make any factual allegations demonstrating the inconsistent application of the

2   <u>Dixon</u> rule. (Doc. 21.)  Indeed, Petitioner does not respond to Respondent's procedural default

3   allegation in any fashion. (<u>Id</u>.)  Consequently, Petitioner has not met his burden of demonstrating

4   inconsistent application of the <u>Dixon</u> rule.[4]  Thus, the Court concludes that Respondent has

5   satisfactorily established that the state court's application of the <u>Dixon</u> rule was an adequate state

6   ground for rejection of Petitioner's claims.

7       4.  <u>Cause and Prejudice Exception</u>.

8       If the respondent has asserted the procedural default doctrine in a timely and proper fashion,

9   and if the default provides an independent and adequate state procedural ground for decision, the

10  petitioner is barred from raising the defaulted claims unless he can 1) excuse the default by

11  demonstrating *cause* for the default and *actual prejudice* as a result, *or* 2) show that the case falls

12  within the category of cases the Supreme Court has characterized as fundamental miscarriages of

13  justice.  <u>Harris</u>, 489 U.S. at 262; <u>Coleman</u>, 501 U.S. at 751.  Cause is a legitimate excuse for the

14  default.  <u>Thomas v. Lewis</u>, 945 F.2d 1119, 1123 (9th Cir. 1991).  Cause exists if the petitioner can

15  show that some objective factor external to the defense impeded efforts to comply with the state's

16  procedural rules.  <u>Coleman</u>, 501 U.S. at 753; <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S.Ct. 2639

17  (1986); <u>see</u> <u>McCleskey v. Zant</u>, 499 U.S. 467, 493, 111 S.Ct. 1454 (1991).  Prejudice is a legitimate

18  excuse for the default.  <u>Thomas</u>, 945 F.2d at 1123.  Actual prejudice exists if the errors complained

19  of created more than a possibility of prejudice; they must have "worked to [the petitioner's] *actual*

20  and substantial disadvantage, infecting [the petitioner's] entire trial with error of constitutional

21  dimensions."  <u>United States v. Frady</u>, 456 U.S. 152, 170, 102 S.Ct.1584 (1982)

22      Here, Petitioner failed to show good cause for his failure to present his claims in his direct

23  appeal. The Court has reviewed the record and finds nothing to support a finding of good cause.

24  Likewise, Petitioner presents no argument for, and makes no showing of, actual prejudice.  In his

25  traverse, Petitioner does not address the issue of procedural default at all.

26

27  _____

28      [4] The same burden-shifting analysis and result applies to the question of whether the <u>Dixon</u> rule was consistently applied at the time of Petitioner's default.  <u>Bennett's</u> burden-shifting analysis assesses adequacy, and adequacy relates to whether the state law ground for decision is  "well-established and consistently applied."  <u>Bennett</u>, 322 F.3d at 583.

5.  Fundamental Miscarriage of Justice.

A petitioner who cannot show cause and prejudice for his procedural default can still bring his claims in a federal habeas petition if he can demonstrate that failure to consider his claims will result in a "fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  "[T]he principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'"  Murray, 477 U.S. at 495 (quoting Engle v. Isaac, 456 U.S. 107, 135, 102 S. Ct. 1558 (1982)).  A fundamental miscarriage of justice occurs when "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851 (1995) (quoting Murray, 477 U.S. at 495-96); Boyd. v. Thompson, 147 F. 3d 1124, 1127 (9th Cir. 1998).

Here, although Petitioner does challenge the eyewitness's identification of him as the assailant, thus implying that he is actually innocent of the crimes for which he was convicted, as the discussion infra demonstrates, the Court rejects Petitioner's claim that insufficient evidence of attempted murder or assault with a firearm was presented.  Indeed, the evidence of Petitioner's guilt was substantial.  Thus, it does not appear to the Court that a "constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup, 513 U.S. at 327.  Accordingly, Petitioner's implicit claim of actual innocence does not rise to the level of a "fundamental miscarriage of justice" sufficient to excuse the absence of cause for the default, and the record here does not support such an inference.

Accordingly, for the reasons stated above, the Court finds that Respondent has timely and adequately raised the procedural default doctrine, and Petitioner's claims in Grounds One and Two are procedurally barred from federal habeas review.  However, even assuming, arguendo, that these claims were not procedurally barred, they must nevertheless be denied on their merits.

**B.  Petitioner's Substantive Claims Should Be Denied.[5]**

**Ground One: Insufficient evidence to support Petitioner's conviction.**

---

[5]Here, because the state court provided no reasoning for its decision other than procedural default, the Court independently reviews the record to determine whether under the AEDPA,  the state court properly denied habeas relief, focusing on whether the state court's resolution of the petitioner's claim was an unreasonable application of clearly established federal law.  See Greene v. Lambert, 288 F. 3d at 1088-89; Delgado, 223 F.3d at 981-82.

Petitioner contends the evidence presented to the jury was insufficient to support the

conviction of attempted murder.  In the discussion attached to the instant petition, Petitioner

identifies the areas in which he feels the prosecution's evidence was deficient:

> "The prosecution's witness Eng Leukhamphan testified under immunity. (RT 717-718).  Eng stated that he did not talk to petitioner about where he suppose to pick petitioner up. (RT 737).  Eng change his testimony stated that petitioner told him to pick petition up around the corner. (RT 735-737).  Eng was asked if petitioner ever told him what petitioner was going to do and Eng stated, "No."  Eng stated that he couldn't tell if he see petitioner or not. (RT 736).  Eng refuse to testify unless he had some sort of a deal to help him for his involvement–possibly his own crime. (RT 790).

> "The victim Konane Materne Mendiola stated that he could smell alcohol on petitioner. (RT 63).  When this case was brought in trial of another case (No. 139840), the victim change his testimony. (RT 555).  Konane stated that he did not see the gun. (RT 57).  He also stated that the suspect stop behind the street light. (RT 558).  Konane change his testimony stating that he saw the gun. (RT 548).

> "Eng Leukhamphan's vehicle was stopped approximately two or three minutes after the report of the shooting came on the policies' radio. (RT 65).  Leukhamphan was identify by the victim as being the suspect in the shooting. (RT 65).  After being arrested, Leukhamphan got scare so he blame the crime on petitioner. (RT 808).  Leukhamphan stated that he did not see the shooter. (RT 810).  He also told the polices that he had an argument with petitioner and drop petitioner off near the canal. (RT 76, RT 810, RT 816).  Leukhamphan admitted the he did not return to Longfellow before the shooting and he did not see petitioner again that night. (RT 813, RT 75).

> "The victim Juan Mendiola stated that he saw the shooter face. (RT 36).  Detective Jolene Gonzales showed a photo lineup to Juan Mendiola.  Juan Mendiola did not identify petitioner as the shooter. (RT 72).  He (Juan) pick out the person who was in the number two position of the photo lineup.  Petitioner was in the number one position of the photo lineup.

> "Namron Ngoun, petitioner's brother, stated that the sweatshirt taken from petitioner's house during the search was a 'black' sweatshirt and that the sweatshirt belong to Johnson, petitioner's youngest brother. (RT 867).  Detective Allen Brocchini was tampering with the sweatshirt.  Detective Brocchini brought in a blue sweatshirt instead of a black sweatshirt.  He describe it as a medium royal blue sweatshirt. (RT 88).

> "The Chief Investigator, Richard Alves, stated that the sweatshirt shown in court on October 26, 1996 by Detective Brocchini is a medium royal blue in color. (RT 828).  Before trial, Detective Brocchini check out the sweatshirt and return it later. (RT 710-711).  At trial, another different sweatshirt was brought in court–a dark blue sweatshirt. (RT 831).

(Doc. 1, App. I, pp. 1-3.)

///

A.   Standard of Review For Sufficiency of the Evidence.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.[6]

It appears to be an open question in the Ninth Circuit whether AEDPA adds a second level of deference to this standard, so that a federal habeas petitioner may obtain relief only by demonstrating that the state court's adjudication on the merits of the claim involved an unreasonable application of Jackson's "no rational trier of fact" standard.  See Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005); Chien v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004)(en banc).  However, the Court here need not address that issue because the Court reaches the same result whether the record is reviewed directly under Jackson or under the more deferential filter of the AEDPA standard.  See id.

This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597 (1981).

///

---

[6] In reviewing sufficiency of evidence claims, California courts expressly follow the standard enunciated in Jackson. See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992).

B.  Sufficient Evidence Was Presented on Attempted Murder.

1.  The Elements of Attempted Murder.

In California, the elements of the crime of attempted murder are "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." People v. Smith, 37 Cal.4th 733, 734 (2005), quoting People v. Lee, 31 Cal.4th 613, 623 (2003).[7]

Hence, in order for a defendant to be convicted of attempted murder of an individual, the prosecution must first prove he acted with specific intent to kill that victim. Id.; People v. Bland, 28 Cal.4th 313, 331 (2002). A defendant manifests an intent to kill by "express malice or by the intentional commission of an act dangerous to life with conscious disregard of that danger (implied malice)." People v. Bland, 28 Cal.4th at 327-328. "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt . . . ." People v. Lashley, 1 Cal.App.4th 938, 945-946 (1991); see also People v. Proctor, 4 Cal.4th 499, 531 (1992); Pen.Code, § 21, subd. (a) ("[t]he intent or intention is manifested by the circumstances connected with the offense"). Intent "is a subjective matter rarely susceptible of direct proof. It must be inferred." People v. Corral, 224 Cal.App.2d 300, 304 (1964), citing, People v. Henderson, 138 Cal.App.2d 505, 509 (1956).

Intent to unlawfully kill and express malice are, in essence, "one and the same." Smith, 37 Cal.4th at 734; People v. Saille, 54 Cal.4th 1103, 1114 (1991). To be guilty of attempted murder of the victims in this case, Petitioner had to have harbored express malice toward each of them. Smith, 37 Cal.4th at 734; People v. Swain, 12 Cal.4th 593, 604-605 (1996). Express malice requires a showing that the assailant "either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur." Smith, 37 Cal.4th at 734-735, quoting People v. Davenport, 41 Cal.3d 247, 262 (1985). Where there are multiple victims, whether the defendant acted with specific intent to kill "must be judged separately as to each alleged victim." Bland, 28 Cal.4th at 331.

---

[7]The jury was instructed with CALJIC No. 8.66 as to these two elements of attempted murder. (CT 568.)

1    Lastly, the crime of attempted murder is not divided into degrees. <u>People v. Bright</u>, 12 Cal.

2  4th 652, 665-669 (1996).  Although the prosecution may seek a jury finding that an attempted murder

3  was "willful, deliberate, and premeditated" for purposes of imposing a sentence enhancement

4  pursuant to Penal Code § 664, subdivision (a), no such special finding was sought in this case.

5  Accordingly, the prosecution only had to prove that Petitioner purposefully shot at the victims with

6  express malice in order to establish the requisite mental state of mind for conviction of attempted

7  murder.  <u>See Smith</u>, 37 Cal.4th at 73.

8           2.  <u>Sufficient Evidence Was Presented To Support A Conviction</u>.

9           In this case, sufficient evidence was presented upon which a reasonable juror could have

10  found that Petitioner harbored "express malice," i.e., that he intended to kill the victims, and also that

11  he engaged in a direct but ineffectual act toward killing the three victims.  Without repeating all of

12  the facts set forth in the Factual Background *supra,* the State's evidence can be summarized as

13  follows: that Petitioner had attended a party with his brother, Namron, and his friend, Eng; that the

14  three had gotten into an altercation with Konane during which Konane's father, Juan, was struck by

15  Petitioner, who was intoxicated at the time; that Petitioner and Eng left the altercation in Eng's car;

16  that Petitioner instructed Eng to drive him home; that Petitioner, who had told Eng he was very angry

17  over the altercation, then obtained a revolver and asked Eng to drive him back to the area of the

18  altercation; that Petitioner confronted Konane, Gerardo, and Juan; that Petitioner fired six or seven

19  shots from the revolver, striking all three men; and that Petitioner then left the scene.  Petitioner was

20  positively identified by Konane as the man who had originally instigated the fight, who had struck

21  Juan, and who later returned with a weapon and shot all three men.  From this overwhelming

22  evidence, a reasonable juror could have concluded both that Petitioner had the specific intent to kill

23  the victims and that he committed a direct but ineffectual act toward accomplishing the intended

24  killings.  This is sufficient to support his conviction under <u>Jackson</u>.

25           Petitioner's arguments vis-a-vis sufficiency of the evidence emphasize the discrepancies

26  between witnesses' testimony, evidence casting doubt on the identification of Petitioner as the

27  assailant, and reasonable inferences Petitioner would have the Court draw from the record.

28  Construing the evidence in the light most favorable to Petitioner, however, is not the appropriate

1    prism for the Court to employ in determining whether sufficient evidence was presented to satisfy

2    constitutional principles.  <u>Jackson</u> cautions reviewing courts to consider the evidence "in the light

3    most favorable to the prosecution."  <u>Jackson</u>, 443 U.S. at 319.  If confronted by a record that

4    supports conflicting inferences, federal habeas courts "must presume–even if it does not

5    affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the

6    prosecution, and must defer to that resolution.  <u>Id</u>. at 326.  Thus, a jury's credibility determinations

7    are entitled to near-total deference under <u>Jackson</u>.  <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir.

8    2004); <u>see Schlup</u>, 513 U.S. at 330 ("[U]nder <u>Jackson</u>, the assessment of the credibility of witnesses

9    is generally beyond the scope of review."); <u>see also United States v. Brady</u>, 579 F.2d 1121, 1127 (9th

10   Cir. 1978)(explaining that, in applying <u>Jackson</u> test for sufficiency of the evidence, "it is the

11   exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary

12   conflicts and draw reasonable inferences from proven facts"); <u>United States v. Ramos</u>, 558 F.2d 545,

13   546 (9th Cir. 1977) ("[T]he reviewing court must respect the exclusive province of the jury to

14   determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences

15   from proven facts, by assuming that the jury resolved all such matters in a manner which supports

16   the verdict.").

17          Petitioner asks the Court to, essentially, re-assess the credibility of the witnesses in direct

18   contravention of the authority discussed above.  This the Court declines to do.  Petitioner's attorney

19   had the opportunity to argue these purported inconsistencies and defects in the prosecution's case to

20   the jury if he so desired; moreover, the jury was properly instructed in how to consider and weigh all

21   of the evidence presented, including instructions that if any crimes were committed, Eng was an

22   "accomplice" to those crimes and that an accomplice's testimony ought to be viewed with distrust.

23   (CT 588-589.)

24          Based on the foregoing, the Court concludes that the state court's decision rejecting

25   Petitioner's claim of insufficient evidence as to attempted murder was not contrary to nor an

26   unreasonable application of clearly established federal law.  Accordingly, Ground One must be

27   rejected.

28   ///

C. <u>Sufficient Evidence Was Presented On Assault With A Deadly Weapon</u>.

1. <u>Elements of Assault With A Deadly Weapon</u>.

The elements of assault with a firearm are (1) an assault, which requires the intent to commit a battery, and (2) the assault was committed with a firearm.  Pen. Code § 245, subd. (a)(2); CALJIC No. 9.02.   The jury in this case was so instructed.  (CT 578.)  In California, assault with a deadly weapon, like simple assault, is an attempt coupled with present ability.  B.E. Witkin & Normal L. Epstein, *California Criminal Law*, sec. 41 (3d ed. 2000).  Thus, even attempting to draw a loaded gun, or drawing it without aiming it, aiming it without firing, or firing it without intent to hit may be sufficient, even though the intended harm is thwarted.  <u>Id.</u>; <u>see</u>, <u>e.g.</u>, <u>People v. Escobar</u>, 11 Cal.App.4th 502, 503, 504 (1992)(victim heard gun being cocked while it was concealed in briefcase and held by defendant); <u>People v. Ingram</u>, 91 Cal.App.2d 912, 913 (1949)(defendant waved revolver, threatened to shoot, shot into refrigerator and floor close to where victim was sitting); <u>People v. Dodini</u>, 51 Cal.App. 179, 180 (1921)(defendant pointed gun, victim's wife screamed, defendant desisted).

2. <u>Sufficient Evidence Was Presented As To Assault With A Deadly Weapon</u>.

Without repeating the evidence discussed previously in this Order, the Court finds that Petitioner has failed to meet his burden of showing the no reasonable juror would have found each of the elements of assault with a deadly weapon beyond a reasonable doubt.  Clearly, a reasonable juror, viewing the evidence in the light most favorable to the prosecution, could have concluded from the evidence presented in this case that Petitioner committed an attempted battery on the three victims, that Petitioner had the present ability to complete the battery, and that he made the attempt with a firearm.  Accordingly, the conviction on this charge was supported by sufficient evidence.  <u>Jackson</u>, 443 U.S. at 319.

As was true with the charge of attempted murder, Petitioner's arguments regarding the purported lack of evidence on the charge of assault with a deadly weapon, recounted *supra*, go to the credibility of the witnesses and the weighing of evidence, responsibilities that are the province of the jury, not of a federal habeas court.  <u>See Bruce v. Terhune</u>, 376 F.3d at 957; <u>Schlup</u>, 513 U.S. at 330; <u>Brady</u>, 579 F.2d at 1127; <u>Ramos</u>, 558 F.2d at 546.  Accordingly, the Court concludes that the state

1   court's rejection of Petitioner's sufficiency of the evidence argument as to assault with a deadly

2   weapon was not contrary to or an unreasonable application of clearly established federal law; hence,

3   Ground One must be rejected.

4        D.   Sufficient Evidence Supports The Sentence Enhancements.

5        Petitioner's sentence was enhanced by separate findings that he had committed the crimes

6   while personally using a firearm, pursuant to Penal Code §12022.5, and with the personal infliction

7   of great bodily injury, pursuant to Penal Code §12022.7.  (CT 607-612; 639.)  Because Petitioner did

8   not specify which portions of his conviction and sentence were unsupported by sufficient evidence,

9   the Court now looks at these enhancements to determine whether, when viewing the evidence in the

10  light most favorable to the prosecution, any reasonable juror could have found these enhancements

11  true beyond a reasonable doubt.  Jackson, 443 U.S. at 319.

12        1.   Section 12022.5.

13        Section 12022.5, subdivision (a), provides in pertinent part that "any person who personally

14  uses a firearm in the commission of a felony or attempted felony" shall be punished by an additional

15  and consecutive term of imprisonment.   The court instructed the jury that a firearm "includes any

16  device designed to be used as a weapon from which is expelled through a barrel a projectile by the

17  force of an explosion or other form of combustion."  (CT 594.)  See CALJIC No. 17.19.  The

18  instruction defined the term "personally used a firearm" as meaning that "the defendant must have

19  intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck

20  or hit a human being with it."  (Id.).

21        It would seem beyond dispute that if sufficient evidence existed for the charged crimes of

22  attempted murder and assault with a firearm, that the elements described above for an enhancement

23  pursuant to § 12022.5 were satisfied beyond a reasonable doubt.  Jackson, 443 U.S. at 319.

24        2.   Section 12022.7.

25        The court instructed the jury that if it found Petitioner guilty on any substantive charge, it

26  must also determine whether he "personally inflicted great bodily harm on Juan Mendiola and

27  Konane Mendiola in the commission or attempted commission of the charged crimes."  (CT 595.)

28  See CALJIC 17.20.  The instruction defined "great bodily injury" as meaning "a significant or

1 | substantial physical injury.  Minor, trivial or moderate injuries do not constitute great bodily injury."

2 | (Id.).   In California,  "Great bodily injury" and "serious bodily injury" are equivalent.  People v.

3 | Villarreal, 173 Cal.App.3d 1136, 1141 (1985).  Great bodily injury is a "significant and substantial

4 | physical injury," as defined in §12022.7, subdivision (f).  See People v. Armstrong, 8 Cal.App.4th

5 | 1060, 1066 (1992).  To meet the requirements of a "significant and substantial injury," permanent or

6 | protracted impairment, disfigurement, or loss of function is not required.  People v. Escobar, 3

7 | Cal.4th 740,750 (1992).

8 | 　　　Here, Juan Mendiola was shot on his left side in his ribs.  (RT 451.)  He testified that he was

9 | kept in the hospital for three days, during which doctors performed exploratory surgery that required

10 | stitches and left a scar near his stomach area.  (RT 459.)

11 | 　　　Konane Mendiola was shot in the lower left side of his back.  (RT 367.)   He testified that he

12 | was taken to the hospital and treated, where he was given x-rays and kept overnight for observation.

13 | (RT 369.)  As a result of his injury, Konane has a scar at the left side of his spine, about half way up

14 | the rib cage.  (RT 367.)

15 | 　　　From the testimony of Juan and Konane Mendiola, a reasonable juror could have concluded

16 | that the prosecution proved beyond a reasonable doubt that these two victims suffered "great bodily

17 | injury" as defined in § 12022.7, subdivision (f), and that Petitioner was the one who inflicted it.  See,

18 | e.g., Villarreal, 173 Cal.App.3d 1136, 1141 (1985)(fracture of victim's nasal bone during assault);

19 | People v. Escobar, 3 Cal.4th at 750 (extensive bruises and raw, bleeding abrasions over victim's

20 | legs, knees, hips and elbows, plus injury to neck preventing movement); People v. Muniz, 213

21 | Cal.App.3d 1508, 1420 (1989)(bruises and severe swelling of eye area lasting four months); People

22 | v. Sanchez, 131 Cal.App.3d 718, 733-734 (1982)(multiple "serious" abrasions, lacerations, bruises,

23 | and swelling); People v. Jaramillo, 98 Cal.App.3d 830, 836 (1979)(contusions, swelling, and severe

24 | discoloration visible the day after infliction); People v. Harvey, 7 Cal.App.4th 823, 826

25 | (1992)(blistering second degree burns).

26 | 　　　Accordingly, Petitioner's sufficiency of the evidence argument as to both of these

27 | enhancements must be rejected.  Jackson, 443 U.S. at 319.

28 | ///

1    Because Petitioner has failed to sustain his burden of showing that any of the convictions on

2    substantive criminal charges or true findings as to sentence enhancements were supported by

3    insufficient evidence, the Court finds, on independent review, that the state court's decision was not

4    contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d).

5    Accordingly, Ground One must be denied.

6    _____**Ground Two:**          **The Trial Court's Refusal To Conduct An Evidentiary Hearing**
                                     **Regarding The Admissibility Of The Sweatshirt Deprived**
7                                    **Petitioner Of His Constitutional Rights.**

8    Petitioner next alleges that the trial court's refusal to conduct an evidentiary hearing

9    regarding the sweatshirt subsequently admitted into evidence deprived him of his constitutional

10   rights.

11       A.  Failure to Present a Federal Question.

12   The basic scope of habeas corpus is prescribed by statute.  Subsection (c) of Section 2241 of

13   Title 28 of the United States Code provides that habeas corpus shall not extend to a prisoner unless

14   he is "in custody in violation of the Constitution."  28 U.S.C. § 2254(a) states:

15       The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
         entertain an application for a writ of habeas corpus in behalf of a person in
16       custody pursuant to a judgment of a State court *only on the ground that he is in
         custody in violation of the Constitution or laws or treaties of the United States*.

17   (emphasis added).  See also Rule 1 to the Rules Governing Section 2254 Cases in the United States

18   District Court.  The Supreme Court has held that "the essence of habeas corpus is an attack by a

19   person in custody upon the legality of that custody . . . ."  Preiser v. Rodriguez, 411 U.S. 475, 484

20   (1973).  Federal habeas review is limited to claims that are set out as described above.

21   The instant claim for relief is deficient because it fails to allege a violation of the Constitution

22   or argue that Petitioner is in custody in violation of the Constitution.  It is well-settled that

23   "incorrect" evidentiary rulings are not the basis for federal habeas relief.  Tinsley v. Borg, 895 F.2d

24   520, 530 (9th Cir.1990), *cert. denied*, 498 U.S. 1091 (1991)  As the Supreme Court has stated, "[I]t

25   is not the province of a federal habeas court to reexamine state-court determinations on state-law

26   questions."  Estelle v. McGuire, 502 U.S. 62, 68 (1991); Gilmore v. Taylor, 508 U.S. 333, 348-49

27   (1993).  Moreover, state law foundational and admissibility questions do not raise federal questions.

28

1   Johnson v. Sublett, 63 F.3d 926, 931 (9ᵗʰ Cir. 1995).

2        Therefore, the state court's discretionary decision to admit the sweatshirt is not a basis for

3   habeas relief.   "[T]he availability of a claim under state law does not of itself establish that a claim

4   was available under the United States Constitution." Sawyer v. Smith, 497 U.S. 227, 239 (1990),

5   quoting, Dugger v. Adams, 489 U.S. 401, 409 (1989).  Because the instant claim is grounded entirely

6   on state law, it is not cognizable on federal habeas and must be dismissed.

7        B.  Review of Claim.

8        Notwithstanding the lack of a federal basis, Ground Two is without merit.  As mentioned

9   previously, under the AEDPA, habeas relief will not be granted unless the adjudication of a state

10  prisoner's claim "resulted in a decision that was contrary to, or involved an unreasonable application

11  of, clearly established Federal law, as determined by the Supreme Court of the United States." 28

12  U.S.C. § 2254(d).  The strongest source of clearly established law implicating Petitioner's claim is

13  Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142 (1986).   Although addressing the exclusion of the

14  circumstances of a defendant's confession, the Supreme Court in Crane nevertheless reaffirmed the

15  general principle that criminal defendants have a "fundamental constitutional right to a fair

16  opportunity to present a defense."  Id. at 687 (citing California v. Trombetta, 467 U.S. 479, 485, 104

17  S.Ct. 2528 (1984));  LaJoie v. Thompson, 217 F.3d 663, 668 (9th Cir. 2000)(The Sixth

18  Amendment's Compulsory Process Clause and the Due Process Clause of the Fifth Amendment have

19  been read to guarantee "criminal defendants a meaningful opportunity to present a complete

20  defense.").  As Justice O'Connor observed:

21          "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment,
            ...or in the Compulsory Process or Confrontation clauses of the sixth Amendment,
22          ...the Constitution guarantees criminal defendants "a meaningful opportunity to
            present a complete defense."

23  Id. at 690 (citing Trombetta, 467 U.S. at 485)(citations omitted); Walters v. Maass, 45 F.3d 1355,

24  1357 (9ᵗʰ Cir.1995)("A state court's procedural or evidentiary ruling is not subject to federal habeas

25  review unless the ruling violates federal law, either by infringing upon a specific federal

26  constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial

27  guaranteed by due process." ); see Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp,

28

926 F.2d 918, 919-20 (9th Cir.1991); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir.1985), *cert. denied*, 478 U.S. 1021 (1986).

The sweatshirt was but one of several bases on which Petitioner was linked to the crimes as the gunman, and it was, in the Court's view, one of the most tenuous.  Most important, of course, was the positive eyewitness identification of Petitioner by Konane as the man who shot him, his father, and Gerardo.  Also significant was Eng's own account of what transpired, which included his admission that when Petitioner went home he was quite upset, that he got a gun, and that he returned to the scene of the original altercation, where shortly thereafter, a man identified by Konane as Petitioner, opened fire on the victims.  Indeed, Petitioner himself admits that he was drunk and that he argued with the victims shortly before they were shot.  Given the strength of this testimony, the admission of the sweatshirt, even if erroneous, and the failure of the court to first conduct a "foundational" hearing on the evidence, was not so prejudicial as to render the trial fundamentally unfair.

Moreover, as the trial court indicated at the time, defense counsel had every opportunity to impeach the witnesses testifying about the sweatshirt and to present his own witnesses to testify about whether this particular sweatshirt was in fact the same sweatshirt that the suspect described by the victims had been wearing.  Indeed, as Petitioner's arguments suggests, Petitioner's own brother, Namron, testified that police took a black sweatshirt from Petitioner's house and that the sweatshirt taken by police belonged to Petitioner's youngest brother, Johnson.  (RT 867.)   Had defense counsel chosen, he could have commented on this discrepancy during closing argument; he did not.  However, the prosecutor did, pointing out to the jurors that, with positive identifications of Petitioner as the assailant, "[y]ou can dismiss the sweatshirt entirely and still have evidence beyond a reasonable doubt that Chek Ngoun was the shooter."  (RT 1132.)

In addition, the jury was  instructed with CALJIC No. 2.92, providing jurors with a framework within which to evaluate eyewitness testimony regarding identification evidence.  (CT 582-583.)  The court also instructed the jury with CALJIC 2.91, which expressly relates the identification of Petitioner as the assailant to the reasonable doubt standard and the prosecution's burden of proof.  (CT 581.)  It is presumed that a jury understood and followed its instructions.

Francis v. Franklin, 471 U.S. 307, 325, fn. 9 (1985).  Accordingly, the state court's refusal to conduct a "foundational" hearing on the admission of the sweatshirt did not render the trial fundamentally unfair.  Crane, 476 U.S. at 687.

The Court additionally concludes that even if the state court erred in excluding the evidence, and even assuming, arguendo, that such an error rose to the level of a constitutional violation, the error was harmless constitutional error under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)("A federal court may grant habeas relief based on trial error only when that error had substantial and injurious effect or influence in determining the jury's verdict."); Calderon v. Coleman, 525 U.S. 141 (1998).  The United States Supreme Court has held that the appropriate standard on collateral review for trial errors such as that asserted in Ground Two is whether the error resulted in "actual prejudice."  Brecht, 507 U.S. at 622- 623, 638.

Petitioner has failed to show actual prejudice resulting from the trial court's refusal to conduct a "foundational hearing" regarding the sweatshirt taken from his residence.  Indeed, the prejudice to Petitioner is difficult to fathom.  *If* the trial court had conducted a "foundational hearing," and *if* the defense had been able to establish that the proffered sweatshirt was different from the one originally taken from Petitioner's home, and *if* Petitioner had been successful in convincing the trial court to exclude the sweatshirt, the jury still had before it evidence that Petitioner wore a dark sweatshirt, that he matched the description given by the victims, and that one victim positively identified him as the assailant.  Under such circumstances, excluding the discovery of a sweatshirt retrieved from Petitioner's room that purportedly matched the description of the one worn by the assailant had little additional probative value as to Petitioner's guilt.  The same can be said even if the jurors had believed the sweatshirt admitted a trial differed from the one originally taken from Petitioner's home by police or that worn by the assailant.

Moreover, even if the state court's refusal to conduct a hearing resulted in some remote prejudice to Petitioner, the state court gave Petitioner's counsel every opportunity to challenge the evidence at trial and to argue any contradictions or insufficiencies in the State's evidence to the jury. It is difficult to comprehend how a foundational hearing, if held, could have benefitted Petitioner's case in any significant way.

1   Given the overwhelming evidence of Petitioner's guilt, a hearing on the foundational basis

2   for admitting the sweatshirt could not have reasonably had an effect on the jury's deliberations, was

3   not actually prejudicial, and was therefore harmless.  Brecht, 507 U.S. at 622- 623, 638.  Hence,

4   Ground Two must be denied.

5   ORDER

6   Accordingly, for the reasons set forth above, the Petition for Writ of Habeas Corpus (Doc. 1),

7   is DENIED with prejudice.

8   The Clerk of Court is DIRECTED to enter judgment in favor of Respondent and close the

9   file.

10

11  IT IS SO ORDERED.

12  Dated:   **March 20, 2006**                                          **/s/ Theresa A. Goldner**
    **j6eb3d**                                                          UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28